[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-15744
_____

D.C. Docket No. 3:10-cv-02830-CLS

UNITED STEEL, PAPER AND FORESTRY, RUBBER,
MANUFACTURING, ENERGY, ALLIED INDUSTRIAL
AND SERVICE WORKERS INTERNATIONAL UNION AFL-CIO-CLC,
USW LOCAL 200,

Plaintiffs - Appellees
Cross-Appellants,

versus

WISE ALLOYS, LLC,

Defendant - Appellant
Cross-Appellee.

_____

Appeals from the United States District Court
for the Northern District of Alabama
_____

(December 8, 2015)

Before ROSENBAUM and JULIE CARNES, Circuit Judges, and GOLDBERG,[*] Judge.

ROSENBAUM, Circuit Judge:

"There's something wrong here, there can be no denyin'."[1]  But it's not what Defendant-Appellant Wise Alloys, LLC (the "Company"), suggests in its appeal of two district-court orders.  In the first of those orders, the district court compelled arbitration of a dispute between the Company and Plaintiffs-Appellees United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC, and its Local (collectively, the "Union") in June 2012.  In the second, the district court enforced the resulting arbitration award in favor of the Union in December 2014.  The problem is, although the June 2012 order compelling arbitration was a final decision when it was issued, the Company did not appeal it until after the district court entered the December 2014 order.  In the words of Carole King, "it's too late, . . . now, it's too late,"[2] and we lack jurisdiction to consider the appeal of the first order.

As for the December 2014 order enforcing the arbitration award, we affirm. On the Union's cross-appeal, we likewise affirm the district court's order denying the Union's motion for attorney's fees in defending the arbitration award.

---

[*] Honorable Richard W. Goldberg, United States Court of International Trade Judge, sitting by designation.

[1] TONI STERN & CAROLE KING, *It's Too Late*, on TAPESTRY (Ode Records 1971).
[2] *Id.*

2

## I. BACKGROUND INFORMATION

### A.  The Collective-Bargaining Agreement

This appeal and cross-appeal represent the latest chapter[3] in the contentious aftermath of a November 2007 collective-bargaining agreement between the Union and the Company.  The Company operates an aluminum rolling mill in Muscle Shoals, Alabama, and the Union represents many of the Company's production workers.

In 2007, the Company and the Union entered into a collective-bargaining agreement ("CBA") for the period of November 1, 2007, to November 1, 2012. The CBA sets forth a schedule of increasing health-care premiums over the five-year duration of the agreement but also contains a cost-of-living-adjustment provision that is designed to offset the amount workers pay in health-care premiums.  More specifically, the weekly health-care premium rates that the adjustment sought to mitigate were set at $20 for the first year, $25 for the second, $30 for the third, $35 for the fourth, and $45 for the fifth.

As relevant, the CBA provides,

> Section 2. Cost of Living Adjustment: Effective on each
> adjustment date, a cost-of-living adjustment will be made
> to the current cost of living allowance. The cost of living
> allowance will be equal to 1¢ per hour for each full 0.3 of

---

[3] We previously considered this same collective-bargaining agreement and cost-of-living provision in *USW v. Wise Alloys, LLC*, 642 F.3d 1344 (11th Cir. 2011).

a point change in the Consumer Price Index calculation. . . .

Section 3. Effective on each adjustment date, the cost-of-living allowance as determined above shall be applied exclusively to help offset health insurance costs for hourly-rated employees. The cost-of-living adjustments under the paragraph shall not be applied to employees' hourly wage rates.

*See USW v. Wise Alloys, LLC*, No. CV–10–S–2830–NW, 2012 WL 2357738, at *2-3 (N.D. Ala. June 15, 2012). The cost-of-living adjustment is calculated quarterly, and the employee's weekly health-care premium is reduced by the appropriate cost-of-living allowance figure.

The CBA also includes a comprehensive, four-step grievance procedure for resolving "[a]ll grievances concerning the interpretation or application of this Agreement." Under the grievance procedure, all grievances must be "presented within ten (10) working days of the occurrence out of which the grievance arose." The CBA further requires that "[g]rievances which are not presented within the specified time limit cannot be presented or considered at a later date."

Step one of the process involves presenting the grievance orally to the employee's immediate supervisor and receiving an answer within two days. Step two requires the Union to put the grievance in writing and present it to the shop superintendent for discussion. Under step three, the Union may elect to elevate the grievance to the Company's Labor Relations Department if it remains unresolved.

4

If the grievance is not resolved at step three, the Union may refer it to the Company's Vice President of Human Resources and involve a USW International Staff Representative at step four. Step four requires that the parties meet to discuss the grievance and that the Vice President issue a written response within thirty days of the meeting. The CBA provides that the time limits of the grievance process may be extended by mutual agreement and that, by mutual agreement, "specific grievances may be initially presented at Step 3 or Step 4."

If the dispute is not resolved through this four-step process, the grievance procedure gives the Union forty-five days from the receipt of the Vice President's answer to move the grievance to binding arbitration by notifying the Company in writing of its wish to do so. Although the arbitration clause declares that "[t]he arbitrator shall have no authority to change, amend, add to, or delete from the provisions of this Agreement," it provides no other constraint on the arbitrator's authority.

The "General Purposes of this Agreement" section of the CBA also contains the following "zipper clause":

> It is the intent of the parties that this Agreement, including the side letter agreements that are dated as of the date of this Agreement and attached to this Agreement, constitute the entire Collective Bargaining Agreement of the parties. Further, the parties agree that the terms of this Agreement should be enforced as written in all cases, regardless of any conflicting practices.

5

**B.  The Current Grievance**

The dispute here centers on conflicting interpretations of the cost-of-living-adjustment provision.  The Union maintains that the cost-of-living adjustments accumulate over the life of the agreement; *i.e.*, that each new adjustment is added to the current allowance.  In contrast, the Company contends that the cost-of-living allowance resets to zero annually when each new CBA-mandated increase in health-care premiums takes effect.

This case arrived at our doorstep through the following course of events:  On December 19, 2008, David Duford, the Company's Labor Relations Manager, sent a letter to Ernest Kilpatrick, the Local's President, notifying him that the Company mistakenly neglected to raise the health premium from $20 to $25 in November 2008.  Although that letter also specified that the Company would "make the necessary adjustments to recover any retroactive health care premiums," it made no reference to cost-of-living adjustments.  Paychecks issued the week of January 15, 2009, reflected the $25 deduction and the retroactive deduction but no corresponding cost-of-living premium reduction.

On February 23, 2009, Duford again wrote Kilpatrick, advising him that, based on the relevant Consumer Price Index information, no quarterly cost-of-living adjustment was warranted and that "the weekly health care premium will remain $25.00 for all applicable employees."  In response, Kilpatrick wrote back

6

on March 2, 2009, agreeing that no quarterly adjustment was needed, but he asserted that, based on the $0.73-per-hour allowance existing at the end of 2008, the $25 premium should be reduced accordingly. In a March 5, 2009 letter, Duford disagreed. Duford also recalled that the Union had been informed in his December 19, 2008, letter about the premium increase to $25, but the Union had made "[n]o timely objections or grievances."

No further action apparently occurred for the next seven months until the Union filed a formal grievance on October 5, 2009. On October 20, 2009, Duford denied the grievance in a letter to now Local President Ken Hunt. In rejecting the grievance, Duford again pointed to the December 19 letter and the January 15 paychecks and added,

> Neither at the time of these events, nor within the time period specified in our Labor Agreement in which a grieving party must bring a claim did the Union nor did any of its members file any timely objections or grievances regarding any of these occurrences, which were widely known and implemented.
>
> Furthermore, there are no provisions in the Labor Agreement whatsoever that provide that COLA be carried over from year to year. COLA offsets, if any, applies [*sic*] only to the contractually established weekly premium in the year in which the offset occurs. The weekly premium is reset annually as provided by the clear terms of our Labor Agreement.
>
> The grievance is rejected as untimely and therefore all claims and demands are waived in its [*sic*] entirety by the Union.

7

On October 26, 2009, the Union elevated its grievance to step four by forwarding it to Sandra Scarborough, the Company's Vice President for Human Resources. No meeting was scheduled and no Company representative, including Scarborough, ever responded to the step-four escalation. On February 12, 2010, the Union notified Scarborough in writing that it desired to submit the grievance to arbitration.

The Union moved forward unilaterally with the arbitration process, sending letters to the Company on July 9 and July 26, 2010, concerning the arbitration panel. On July 28, 2010, Duford responded to these efforts by reiterating the Company's position that the grievance was untimely. Duford elaborated, "There is no ambiguity that untimely grievances are not arbitrable under our Labor Agreement, and we clearly advised the Union of our position in this regard on October 20, 2009." Duford also expressed the position that "issues of arbitrability like the one presented here" are matters for judicial determination, not resolution by the arbitrator. Finally, Duford closed his July 28 letter by stating, "[The Company] will not agree to submit the above-referenced issue to arbitration because it conflicts with the terms of our Labor Agreement concerning issues that are subject to grievance and arbitration."

8

## C. The Union Goes to Court

On October 19, 2010, the Union filed a complaint in the Northern District of Alabama pursuant to section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. In the sole count of the complaint, the Union alleged that the Company "violated the collective bargaining agreement by refusing to arbitrate the COLA reset grievance" and requested "that the Court order the Company to submit the grievances to arbitration as provided under the collective bargaining agreement and for any other legal and/or equitable relief the Court deems appropriate." The Union made no other requests for relief in its complaint.

In response, the Company answered that the grievance was not arbitrable because it was untimely under the CBA. It also raised, as a defense, that the lawsuit to compel arbitration was untimely under the statute of limitations.

Both parties moved for summary judgment. Citing the relevant six-month statute of limitations on actions to compel arbitration, the Company argued that the Union's lawsuit was barred because the Company "unequivocally refused" to arbitrate the grievance in its October 20, 2009, letter. The Company also contended that even if not barred by the limitations period, the grievance was not arbitrable because it was untimely, and timeliness is not a matter for arbitration.

In response, the Union asserted that timeliness of the grievance was, in fact, a matter for arbitration. Plus, in any event, the Union urged, the grievance was

9

timely because the Company's refusal to apply the cost-of-living adjustments to each paycheck was a continuing violation. The Union also countered the statute-of-limitations argument by asserting that the Company had not unequivocally refused arbitration until its July 28, 2010, letter.

The district court agreed with the Union and granted summary judgment compelling arbitration on June 15, 2012. *Wise Alloys*, 2012 WL 2357738, at *12. Ultimately, the court rejected the notion that timeliness was inappropriate for arbitration. *Id.* Instead, the court found that the "parties' dispute is a dispute over the application of the time limitations in the grievance procedure contained within the contract, rather than a dispute over the arbitrability of the grievance." *Id.*

Turning to the question of whether the Company had made an unequivocal refusal to arbitrate, the court recognized that the Company need not have expressly used the language "refuse to arbitrate." *Id.* at *8-9. Nevertheless, the district court concluded that the October 20, 2009, letter "is best construed as a statement expressing [the Company's] position in response to [the Union's] grievance—*i.e.*, [the Company's] reason for denying the grievance. It does not indicate—either expressly or impliedly—that [the Company] would not agree to arbitration." *Id.*

And, because the district court concluded that the timeliness of the grievance was arbitrable, it reasoned that the Company's "statement could be reasonably construed as indicating that [the Company] would assert before the arbitrator that

10

[the Union's] grievance should be denied because it was not timely filed, rather than asserting that [the Company] refused to engage in arbitration." *Id.* at \*9.

In concluding its order, though, the district court—apparently *sua sponte*—expressed its "opinion that the case should be stayed, rather than dismissed, pending a final resolution following arbitration." *Id.* at \*13. Citing section 3 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, and Circuit case law, the district court apparently determined that it was required to stay the case when compelling arbitration. *Id.* Accordingly, the district court stayed the case but also administratively closed the case file. *Id.* In doing so, the court noted that "[t]his action will have no effect on the court's retention of jurisdiction, and the file may be reopened, on either party's motion, for an appropriate purpose such as dismissal following settlement, entry of judgment, vacatur, or modification of an arbitrator's award." *Id.* The court also directed the parties to notify the court of any settlement or arbitration determination. *Id.* at \*14.

## D. The Arbitration and the Return to Court

The case proceeded to arbitration before Mitchell B. Goldberg, who issued his decision on January 22, 2014. Goldberg determined that the Union should have known about the facts giving rise to the grievance in December 2008 or January 2009. Nevertheless, Goldberg concluded that the failure to deduct the cost-of-living adjustment from the health-care premiums was in the nature of a continuing

11

violation, so the grievance was timely filed with respect to paychecks issued no more than ten days before the Union's formal grievance was filed on October 5, 2009.

Regarding the merits of the dispute, Goldberg acknowledged that both sides believed the CBA's language was unambiguous. Because no language in the CBA either expressly carries over or expressly resets the cost-of-living allowance each year, though, Goldberg found that the CBA possessed a "latent ambiguity."

In view of the ambiguity, Goldberg looked to extrinsic evidence of the parties' negotiations and their prior course of dealing as it related to cost-of-living provisions applied to employee wages under the previous CBA. After conducting this analysis, Goldberg determined that, in the absence of any express language changing the practice in the new CBA, the cost-of-living adjustments "should work the same way it was done in the preceding CBA" and accumulate over time.

The Union notified the district court of the award on January 31, 2014. On March 5, 2014, the Company filed a motion to reopen the case and vacate the award.

The Company argued the award was unenforceable because Goldberg exceeded his authority under the CBA by ignoring the zipper clause when consulting extrinsic evidence and by violating the no-modification provision that prohibits an arbitrator from changing the terms of the CBA. On March 20, 2014,

the Union "joined with" the Company in seeking to reopen the case, and "to the extent necessary," moved to amend their original complaint to state a claim for enforcing the arbitration award and for attorney's fees.  The Union argued that Goldberg's decision fell within his authority as arbitrator and the Company's objections were meritless.  In addition, the Union sought attorney's fees under the court's equitable powers to punish the Company for filing a meritless challenge to the arbitration award.

On December 9, 2014, the district court denied the Company's motion to vacate and granted the Union's motion to enforce the award.  Noting that a federal court's review of an arbitration award is exceedingly narrow and deferential, the district court upheld the arbitrator's continuing-violation determination as a permissible construction of the CBA.  The district court also determined that, as an extension of binding former Fifth Circuit precedent, if a contract contains an ambiguity, an arbitrator may look to extrinsic evidence to resolve that ambiguity despite the presence of a zipper clause.  Here, again applying the same highly deferential standard of review applicable to an arbitration award, the district court agreed that the arbitrator was justified in finding within the cost-of-living provision a "yawning void" that "cried out" for construction through extrinsic evidence.  Finally, the district court denied attorney's fees to the Union because it concluded

that the Company's motion "was not baseless, frivolous, or filed for an improper purpose."

Both parties now appeal. The Company filed a notice of appeal on December 23, 2014, challenging the district court's June 2012 order compelling arbitration and the district court's December 2014 order confirming the arbitration award. The Union cross-appeals the denial of attorney's fees.

## II. STANDARDS OF REVIEW

We review *de novo* a district court's order to compel arbitration. *Bautista v. Star Cruises*, 396 F.3d 1289, 1294 (11th Cir. 2005). Similarly, we review a district court's application of the statute of limitations *de novo*. *United States v. Gilbert*, 136 F.3d 1451, 1453 (11th Cir. 1998).

We must *sua sponte* examine the existence of appellate jurisdiction and review jurisdictional issues *de novo*. *United States v. Lopez*, 562 F.3d 1309, 1311 (11th Cir. 2009). As for a district court's confirmation of an arbitration award and its denial of a motion to vacate an award, we review findings of fact for clear error and legal conclusions *de novo*. *Frazier v. CitiFinancial Corp., LLC*, 604 F.3d 1313, 1321 (11th Cir. 2010). We review a district court's denial of attorney's fees for an abuse of discretion. *Byars v. Coca-Cola Co.*, 517 F.3d 1256, 1263 (11th Cir. 2008).

## III. DISCUSSION

### A.    We Lack Jurisdiction over the Company's Appeal of the Order Compelling Arbitration

In civil actions, a notice of appeal must be filed "within 30 days after entry of the judgment or order appealed from."  Fed. R. App. P. 4(a)(1)(A); 28 U.S.C. § 2107(a).  Satisfying this requirement is a prerequisite to our exercise of appellate jurisdiction in civil cases.  *Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emp'rs*, __ U.S. __, 134 S. Ct. 773, 779 (2014).  In this case, a single notice of appeal was filed.  Although that notice of appeal was filed within thirty days of the district court's order confirming the arbitration award, it was not filed until two-and-a-half years after the district court's order compelling arbitration.

We have held that an order compelling arbitration triggered by a complaint seeking solely such an order is generally considered final and appealable because it "resolves the only issue before the district court."  *Thomson McKinnon Sec., Inc. v. Salter*, 873 F.2d 1397, 1399 (11th Cir. 1989) (per curiam); *see also* 9 U.S.C. § 16(a)(3);[4] *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 84-89, 121 S. Ct. 513, 519-21 (2000) (holding that a "final decision with respect to an arbitration" is

---

[4] Although the parties do not agree on whether the provisions of the FAA, 9 U.S.C. §§ 1-16, directly apply to collective-bargaining arbitration disputes brought under section 301 of the LMRA, the law construing the FAA nevertheless provides instructive guidance on these matters. *See, e.g.*, *Wise Alloys*, 642 F.3d at 1352-54, 1353 n.4; *Am. Postal Workers Union v. U.S. Postal Serv.*, 823 F.2d 466, 470-73 (11th Cir. 1987).

one that "ends litigation on the merits and leaves nothing more for the court to do but execute the judgment"); *Miller v. Drexel Burnham Lambert, Inc.*, 791 F.2d 850, 852 (11th Cir. 1986) (per curiam) ("The classic example [of an order compelling arbitration being final] is that of an action brought solely to obtain an arbitration order pursuant to § 4 of the Federal Arbitration Act, 9 U.S.C. § 4."), *abrogated on other grounds by Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 108 S. Ct. 1133 (1988).

And the Supreme Court has expressly and long held that orders compelling arbitration on a complaint seeking specific performance of an arbitration provision under the LMRA are final and appealable. *See Goodall-Sanford, Inc. v. United Textile Workers of Am., A.F.L. Local 1802*, 353 U.S. 550, 550-52, 77 S. Ct. 920, 920-21 (1957) ("The right enforced here is one arising under [section 301(a) of the LMRA]. Arbitration is not merely a step in judicial enforcement of a claim nor auxiliary to a main proceeding, but the full relief sought. A decree under [section 301(a) of the LMRA] ordering enforcement of an arbitration provision in a collective bargaining agreement is, therefore, a 'final decision' within the meaning of [28 U.S.C. § 1291].").

In *Green Tree*, the plaintiff sued her lender for alleged violations of the Truth in Lending Act and the Equal Credit Opportunity Act. 531 U.S. at 82-83, 121 S. Ct. at 517-18. In response, the lender filed "a motion to compel arbitration,

16

to stay the action, or, in the alternative, to dismiss." *Id.* at 83, 121 S. Ct. at 518. The district court compelled arbitration, denied a stay, and dismissed the plaintiff's complaint. *Id.* This Court concluded that appellate jurisdiction existed over the plaintiff's appeal, and a unanimous Supreme Court affirmed that conclusion. *Id.* at 84, 121 S. Ct. at 518-19.

In doing so, the Supreme Court specifically rejected the idea that whether an order was favorable or hostile to arbitration had any bearing on finality. *Id.* at 86, 121 S. Ct. at 519. Instead, the Court confirmed the "well-established" and "longstanding" definition of finality: a decision that "ends the litigation on the merits and leaves nothing more for the court to do but execute the judgment." *Id.* at 86, 121 S. Ct. at 519.

Applying the lessons of *Green Tree* here, we conclude that the order compelling arbitration was unquestionably a final order under either the LMRA or the FAA: the Union's complaint sought only to compel arbitration. Once the court granted the relief that the Union sought in the single count of its complaint and compelled arbitration, nothing remained for the court to do but execute that judgment.

Nor are we convinced by the parties' contentions that the district court's stay of the case effectively made the final order an interlocutory one, obviating the need to file a notice of appeal until the district court lifted the stay and entered a final

17

judgment.  *See Am. Express Fin. Advisors, Inc. v. Makarewicz*, 122 F.3d 936, 939 (11th Cir. 1997); *see also* 9 U.S.C. § 16(b)(2).  We disagree with the parties' view for several reasons.

First, the district court's stay was neither warranted under nor authorized by statute or precedent.  While the district court cited section 3 of the FAA, 9 U.S.C. § 3, as the source of its authority for the stay, *Wise Alloys*, 2012 WL 2357738, at *13, the text of the statute provides no basis for applying it in this LMRA case either directly or by analogy.  Section 3 applies to only "any suit or proceeding . . . brought . . . *upon any issue referable to arbitration*."  9 U.S.C § 3 (emphasis added).  Here, the Union did not bring suit upon a substantive *issue referable* to arbitration; it brought suit instead solely to compel arbitration.

In addition, section 3 qualifies the mandatory nature of any stay it authorizes by requiring a party to apply for the stay:  "the court . . . shall *on application of one of the parties* stay the trial."  *Id.* (emphasis added); *see also Lloyd v. HOVENSA, LLC*, 369 F.3d 263, 269 (3d Cir. 2004) ("Here, the plain language of § 3 affords a district court no discretion to dismiss a case *where one of the parties applies* for a stay pending arbitration." (emphasis added)).  The record here contains no indication that either party requested a stay of this action.

Beyond these two points, the statute requires staying "the trial of the action."  9 U.S.C. § 3.  In this case, though, once the district court granted summary

18

judgment on the sole relief sought—compelled arbitration—no "action" to be tried existed, so there was nothing to stay. For these reasons, the terms of section 3 of the FAA simply do not apply to the situation presented in this case, and the statute cannot justify the stay.

The district court also felt constrained by our prior decision in *Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698 (11th Cir. 1992), as well as the Third Circuit's decision in *Lloyd* to impose a stay. *Wise Alloys*, 2012 WL 2357738, at *13. But those decisions are distinguishable precisely because section 3, by its terms, did apply in those circumstances. In both cases, the plaintiff brought claims on issues referable to arbitration, and in response, the defendants sought to compel arbitration. *See Lloyd*, 369 F.3d at 269; *Bender*, 971 F.2d at 699. In those circumstances, upon a party's motion, a stay was mandatory under section 3 because the cases were brought on, among other issues, issues themselves arguably referable to arbitration. *See Lloyd*, 369 F.3d at 269 ("[Section 3] clearly states, without exception, that whenever suit is brought *on an arbitrable claim*, the Court 'shall' upon application stay the litigation until arbitration has been concluded." (emphasis added)). That is not the case here, where the only cause of action in the case was for an order compelling arbitration. Unlike in *Bender* and *Lloyd*, no party in this case filed a substantive claim—that is, a claim that was arbitrable. Because

19

section 3 by its terms is inapplicable in this case, our precedent affirming section 3 stays is simply not instructive.

Nor is a stay warranted in circumstances such as these. When a court's grant of summary judgment compelling arbitration resolves the entirety of the plaintiff's complaint, no "burden" of continuing parallel litigation exists to protect against. *Contra Wise Alloys*, 2012 WL 2357738, at \*13 (quoting *Lloyd*, 369 F.3d at 270). Moreover, staying a case has no practical effect without staying the order granting relief on the only claim in the case. Indeed, staying a case without staying a final decision on the only claim in the case renders the decision no less final than staying a thirtieth birthday makes a person perpetually twenty-nine years old.

The stay also cannot be justified on the basis that a party might later seek to vacate or confirm any arbitration award. Federal law permits a party to bring a separate proceeding to do just that. *See Wise Alloys*, 642 F.3d at 1349 ("An arbitration award pursuant to an arbitration provision in a collective bargaining agreement is treated as a contractual obligation that can be enforced through a § 301 lawsuit."). And, as the Supreme Court has explained, "[T]he existence of that remedy does not vitiate the finality of the District Court's resolution of the claims" in what is otherwise a final decision. *Green Tree*, 531 U.S. at 86, 121 S. Ct. at 520.

20

In addition, the need for any post-arbitration proceedings was wholly speculative at the time the district court entered the stay, and speculative post-arbitration proceedings cannot impact the finality of orders compelling arbitration. *Cf. Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 199-200, 108 S. Ct. 1717, 1720-21 (1988) ("A question remaining to be decided after an order ending litigation on the merits does not prevent finality if its resolution will not alter the order or moot or revise decisions embodied in the order.").

We are also unconvinced by the Company's reliance on a footnote in *Green Tree* in which the Supreme Court cited section 16(b)(1) of the FAA and observed that "[h]ad the District Court entered a stay instead of a dismissal in this case, that order would not be appealable." *See* 531 U.S. at 87 n.2, 121 S. Ct. 520 n.2. Relying on this footnote, the Company asserts that the Supreme Court endorsed the idea that section 16(b)(1) empowers district courts in all cases to stay cases where they have entered orders compelling arbitration.

We disagree. To explain why, we first review section 16 of the FAA:

> (a) An appeal may be taken from—
> . . .
> (3) a *final decision* with respect to an arbitration that is subject to this title.
> (b) Except as otherwise provided in section 1292(b) of title 28, an appeal may not be taken from an *interlocutory order*—
> (1) granting a stay of any action under section 3 of this title;
> . . . .

21

9 U.S.C. § 16 (emphases added). Significantly, section 16 distinguishes between "final decision[s]" and "interlocutory orders" in setting forth permissible ways of proceeding. The statute expressly specifies that final decisions are appealable under it. As for actions that may be stayed under section 3, as relevant here, by its terms, section 16 explicitly limits that option to cases where the court has entered an interlocutory order.

The Supreme Court's statement that "[h]ad the District court entered a stay instead of a dismissal in this case, that order would not be appealable[,]" *Green Tree*, 531 U.S. at 87 n.2, 121 S. Ct. at 520 n.2, must necessarily be read against the background of section 16, which the Court cited. In this light, we understand the Supreme Court to have been opining on the particular factual circumstances in *Green Tree*. Under the particular facts of that case, whether the district court entered a stay or a dismissal affected whether the district court's order was interlocutory or final. As a result, whether the district court entered a stay or dismissal governed whether section 16(a)(3) or section 16(b)(1) applied, and thus, whether the order was appealable.

The particular facts in *Green Tree* that would have allowed the district court to have granted a stay instead of a dismissal[5] (thus rendering the order

---

[5] It is not clear that the district court in *Green Tree* had the authority to enter a dismissal of the plaintiff's substantive claims. But since it dismissed the claims and no party challenged

interlocutory instead of final) do not exist in the case before us. In *Green Tree*, the plaintiff brought claims under the Equal Opportunity Credit Act and the Truth in Lending Act. Simply ordering the case to arbitration did not technically dispose of the substantive claims that the plaintiff had brought, requiring the court to proceed with parallel litigation, stay the claims, or possibly dismiss the case.[6] The district court chose the last course, but it could have entered a stay instead of dismissing the plaintiff's claims. Had it done so, the plaintiff's claims would have remained pending, rendering the district court's order compelling arbitration interlocutory instead of final. But here, because the district court's order compelling arbitration resolved the merits of the only claim for relief advanced by any party to the action, the order was final, so nothing remained for the district court to stay.

Because the stay entered by the district court was neither required nor authorized, we conclude that it could not have transformed what was, by definition, a final order into an interlocutory one. As a result, the Company had to appeal the

---

the dismissal as beyond the district court's authority, the Supreme Court specifically declined to consider that question, noting that "whether the District Court should have taken that course is not before us, and we do not address it." *Green Tree*, 531 U.S. at 87 n.2, 121 S. Ct. at 520 n.2. In other words, the Supreme Court did not evaluate whether the district court could permissibly turn what may have been required to have been issued as an interlocutory order into a final decision. We do not have the luxury of not considering the opposite question—whether the district court could have made what was clearly a final decision into an interlocutory order simply by staying the case—because our jurisdiction depends on the answer to the question.

[6] Again, it is not clear that the district court could have permissibly decided to dismiss the case. *See supra* at n.5.

23

order compelling arbitration within thirty days.[7]  Fed. R. App. P. 4(a)(1)(A); 28 U.S.C. § 2107(a).   Because the filing of a timely notice of appeal is both "mandatory and jurisdictional," *Bowles v. Russell*, 551 U.S. 205, 209, 127 S. Ct. 2360, 2363 (2007), the absence of a timely notice here divests us of jurisdiction over that aspect of the Company's appeal.[8]

We note briefly, though, that if appellate jurisdiction did exist, we would have affirmed the district court's order compelling arbitration, anyway.  We have held that, in Alabama, the six-month period in which to bring an action to compel arbitration under section 301 of the LMRA "begins to run when one party unequivocally refuses to arbitrate the dispute." *Aluminum Brick & Glass Workers Int'l Union v. AAA Plumbing Pottery Corp.*, 991 F.2d 1545, 1548 (11th Cir. 1993). We agree with the district court's conclusion that the Company's October 20, 2009, letter was not an unequivocal refusal to arbitrate.

---

[7] The Union points out that the district court never entered a separate judgment in accordance with Federal Rule of Civil Procedure 58(a).  This does not affect the timeliness issue here because, under Rule 58(c)(2)(B), judgment was entered at the latest 150 days after the district court's June 15, 2012, summary-judgment order—a period that lapsed well before the Company's December 23, 2014, Notice of Appeal was filed.

[8] We acknowledge that the Company relied in part on the district court's entry of a stay in deciding not to appeal the June 2012 order within thirty days of its entry.  We note, however, that, at oral argument, counsel conceded that other considerations also entered into the Company's decision not to appeal immediately.  Regardless of the reason for the Company's failure to timely appeal the June 2012 order, though, the timeliness requirement is jurisdictional, so we have no power to ignore, excuse, or waive the failure to file a timely notice of appeal. *See Bowles*, 551 U.S. at 213-14, 127 S. Ct. at 2366 (holding that failure to file a timely notice of appeal in a civil case is a mistake "of jurisdictional magnitude" that cannot be overcome by "forfeiture or waiver" or "unique circumstances" or any other "equitable exceptions").  To once again borrow a phrase from Carole King, we "just can't fake it, oh, no, no."

24

First, the district court reasoned that the timeliness of the Union's cost-of-living-provision grievance was itself arbitrable.  In contrast with its position in the district court, *see Wise Alloys*, 2012 WL 2357738, at *10-12, the Company does not contest this conclusion in its appeal.

Against the background that the timeliness of the Union's grievance itself raised an arbitrable issue, the district court considered the Company's position in the October 20, 2009, letter, stating that "[t]he grievance is rejected as untimely and therefore all claims and demands are waived in its [*sic*] entirety by the Union."  The court concluded that the statement could fairly be read as the position that the Company was taking *in* arbitration rather than its position *on* arbitration.  *See id.* at *9.    Because the court's determination that timeliness is arbitrable stands unchallenged, nothing in the Company's October 20 letter precludes an interpretation that the letter was staking out the Company's position for future arbitration.  As a result, the district court properly determined that the Company's letter was not an unequivocal refusal to arbitrate.

## B. The District Court Correctly Enforced the Arbitration Award

The Company also challenges the district court's refusal to vacate the arbitration award.  It premises its argument on two provisions of the CBA: the general-purpose zipper clause, requiring the CBA to be enforced as written and without resort to conflicting practices, and the no-modification provision of the

arbitration clause, prohibiting an arbitrator from amending or rewriting the CBA. First, the Company contends that the arbitrator exceeded his authority under the CBA by effectively "amending" the CBA to create a "continuing-violation exception" to the ten-day grievance-filing time limit. Second, the Company maintains that the arbitrator overreached his authority by going beyond the written language of the cost-of-living provision and looking to extrinsic evidence of the parties' prior CBA practices to resolve the dispute. We find no error in the district court's resolution of the Company's challenge to the arbitration award.

*1. Judicial Review of Arbitration Awards Is Highly Circumscribed*

A federal court's review of an arbitration award is highly deferential and extremely limited. *See, e.g.*, *Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836, 843 (11th Cir. 2011); *Osram Sylvania, Inc. v. Teamsters Local Union 528*, 87 F.3d 1261, 1263 (11th Cir. 1996). We do not review claims of factual or legal error by an arbitrator in the same manner as we review the decisions of district courts. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S. Ct. 364, 370 (1987). Instead, we review a labor arbitration award for "whether [it] is irrational, whether it fails to draw its essence from the collective bargaining agreement or whether it exceeds the scope of the arbitrator's authority." *Osram Sylvania*, 87 F.3d at 1263 (quoting *Butterkrust Bakeries v. Bakery, Confectionery & Tobacco Workers Int'l Union, AFL-CIO, Local No. 361*, 726 F.2d 698, 699

26

(11th Cir. 1984)).  That is not to say that an arbitrator may "dispense his own brand of industrial justice.  He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement."  *USW v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S. Ct. 1358, 1361 (1960).  An award draws "its essence from the collective bargaining agreement if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention."  *Wise Alloys*, 642 F.3d at 1531 (quoting *Int'l Union of Dist. 50, Mine Workers of Am. v. Bowman Transp., Inc.*, 421 F.2d 934, 936 (5th Cir. 1970)).

Under this standard, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."  *Misco*, 484 U.S. at 38, 108 S. Ct. at 371; *Delta Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 861 F.2d 665, 670 (11th Cir. 1988) ("An arbitrator's result may be wrong; it may appear unsupported; it may appear poorly reasoned; it may appear foolish. Yet, it may not be subject to court interference.").  To prevail in vacating an arbitration award, the challenger "must refute every reasonable basis upon which the arbitrator may have acted."  *Osram Sylvania*, 87 F.3d at 1264.

*2. The "Continuing Violation" Theory Was a Permissible Construction of the CBA*

The Company's entire argument against the arbitrator's award depends on its characterization of the arbitrator's "continuing violation" determination as an *amendment* or *change* to the CBA rather than an interpretation of it. This is necessarily so because if Goldberg's decision were just an *interpretation*—even an incorrect interpretation—of the CBA, we would be powerless to vacate the award. *See Misco*, 484 U.S. at 38, 108 S. Ct. at 371 ("The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract."). After careful consideration, we agree with the district court that the Goldberg's decision was merely a matter of contract interpretation, not an impermissible amendment of the CBA.

The CBA's grievance procedure sets a ten-day clock for filing grievances that begins ticking after the event giving rise to the grievance occurs. That's all it does. The CBA contains no discussion of how to handle violations that continue occurring after the relevant grievance is filed. Nor does the CBA contain any language construing whether violations of this type occur once—the initial failure to carry over the cost-of-living allowance—or recur each time the Company fails to deduct the cost-of-living allowance from the weekly health-care premium. In

28

the absence of plainly dispositive language in the CBA, Goldberg plausibly determined that the Union's grievance about the Company's failure to deduct the cost-of-living allowance was best characterized as a continuing violation recurring on each weekly paycheck.

Significantly, Goldberg limited the Union's grievance to those paychecks issued from ten days before the grievance was filed and forward. By limiting the recovery in this fashion, Goldberg gave effect to the party's written ten-day deadline; he did not rewrite it. Indeed, this might be a completely different case if Goldberg had used a continuing-violation theory to toll the ten-day period all the way back to November 2008. But he did not do so. Instead, he appropriately constrained his award.

Whether we would agree that Goldberg's interpretation was correct, or that a better interpretation would require new grievances filed after each paycheck, or that a grievance such as this "occurs" only initially, is immaterial. Goldberg did not, as the Company argues, create "a way around the strict grievance time limits in the CBA"; he interpreted and applied those limits. Because no plain language in the CBA addressed the issue, Goldberg acted within the scope of his authority and his decision permissibly "g[ave] meaning to the language of the agreement." *Misco*, 484 U.S. at 38, 108 S. Ct. at 371; *see also UMass Mem'l Med. Ctr., Inc. v. United Food & Commercial Workers Union, Local 1445*, 527 F.3d 1, 3, 6-7 (1st

Cir. 2008) (affirming arbitral award under a collective-bargaining agreement with a similar grievance time limit based on determination that a pay violation recurred with each new check).[9]

### 3. The Arbitrator Permissibly Considered Extrinsic Evidence to Resolve an Ambiguity

The Company also argues that Goldberg's decision on the underlying dispute ran afoul of the zipper clause—by considering extrinsic evidence of the parties' past collective-bargaining agreements—and the arbitration clause—by amending the "unambiguous" CBA to make the cost-of-living adjustments accumulate. As with the timeliness issue, the Company's arguments lack merit because Goldberg was within his authority to conclude that an ambiguity existed within the CBA, and he permissibly resorted to extrinsic evidence to interpret the parties' contract.

First, we agree that Goldberg permissibly concluded that an ambiguity existed. The text of the CBA does not explain whether the cost-of-living adjustments accumulate each year or the allowance is reset each year. Contrary to

---

[9] The Company attempts to distinguish *UMass* by asserting that the First Circuit considered only whether the violation at issue could be viewed as continuing but did not evaluate whether a continuing-violation theory was permitted under the language of the agreement involved. But the hospital in *UMass* made the nearly identical argument the Company makes here—that an arbitrator's continuing-violation theory essentially nullified the strict timeliness provisions of that agreement, in violation of a similar no-modification clause. *UMass*, 527 F.3d at 3-4. Accordingly, the Company's argument falls flat. In holding that the violation could be continuous and affirming the arbitral award, the First Circuit implicitly affirmed the authority of the arbitrator under the agreement to characterize the violation as continuous in making the award.

the Company's assertion, the setting of new health-care premiums each year simply does not address how the cost-of-living adjustment impacts those premiums.

Had the CBA lacked ambiguity, Goldberg's reference to past practices clearly would have run afoul of the zipper clause. But Goldberg acted within his authority when he interpreted the CBA to find an ambiguity. *See Misco*, 484 U.S. at 38, 108 S. Ct. at 371. As a result, Goldberg had to resolve that ambiguity. To do so, he appropriately looked to evidence of the parties' past practices.

Binding and persuasive precedent in this Circuit establishes that an arbitrator may look to extrinsic evidence to resolve an ambiguity in a collective-bargaining agreement. *See IBEW Local Union No. 199 v. United Tel. Co. of Fla.*, 738 F.2d 1564, 1568-69 (11th Cir. 1984); *Boise Cascade Corp. v. United Steelworkers of Am., AFL-CIO, Local Union No. 7001*, 588 F.2d 127, 129-30 (5th Cir. 1979); *Textile Workers Union of Am., AFL-CIO, CLC v. Textile Paper Prods., Inc.*, 405 F.2d 397, 399 (5th Cir. 1968); *see also Loveless v. E. Air Lines, Inc.*, 681 F.2d 1272, 1278 n.14 (11th Cir. 1982) ("The arbitrator might then be able to resolve the latent ambiguity by resort to permissible sources of extrinsic evidence."); *Aeronautical Machinists v. Lockheed*, 683 F.2d 419, 1982 WL 172521, at *2, *4 (11th Cir. 1982) (unpublished table opinion); *cf. United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581-82, 80 S. Ct. 1347, 1352

(1960) ("The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it.").

While it is true that none of these cases involve both a no-modification clause *and* a zipper clause, the presence of a zipper clause does not defeat the traditional rule that ambiguities can be resolved by looking to extrinsic evidence. If it did, zipper clauses would handcuff arbitrators faced with ambiguities, severely—or even completely—limiting their abilities to construe collective-bargaining agreements and to resolve disputes in a reasoned fashion. Such a result not only would run counter to the bargained-for arbitration provision—which clearly envisions empowering an arbitrator to resolve disputes, not running him into a dead end—but also would conflict with the Supreme Court's recognition that an arbitrator must give reasoned meaning to the parties' agreement. *See Misco*, 484 U.S. at 38, 108 S. Ct. at 371.

Nor are any of the cases that the Company relies on to support its argument that the arbitrator could not look to extrinsic evidence because a zipper clause exists in the CBA instructive. Unlike the case here, none of those cases involve an ambiguity. In *Anheuser-Busch, Inc. v. Local Union No. 744*, 280 F.3d 1133 (7th

Cir. 2002), one judge[10] of the Seventh Circuit held that an arbitrator violated zipper and no-modification clauses by consulting a past employment practice to justify an award. *Id.* at 1135-36, 1139 (Coffey, J.). But in that case, the arbitrator modified the contract to correct a perceived unfairness by overwriting the express contract with the parties' past practices. *See id.* at 1134-36, 1144 (Coffey, J.). No ambiguity requiring interpretation existed; the parties agreed there was no ambiguity in the contract language; and the arbitrator did not purport to find an ambiguity. *See id.* at 1139-40 (Coffey, J.). And, in fact, Judge Coffey affirmed that an arbitrator may consult past practices to resolve an ambiguity should one exist. *See id.* at 1139.

Both *Leed Architectural Products, Inc. v. USW Local 6674*, 916 F.2d 63 (2d Cir. 1990), and *Pennsylvania Power Co. v. Local Union No. 272, IBEW*, 276 F.3d 174 (3d Cir. 2001), similarly did not address the construction of a contract ambiguity. Instead, in those cases, the arbitrator impermissibly dispensed "industrial justice" by modifying an unambiguous contract to correct a perceived unfairness. *See Leed*, 916 F.2d at 64-65, 66; *Pa. Power Co.*, 276 F.3d at 179-80.

Finally, the Company suggests that Goldberg's failure to expressly discuss the zipper clause when he relied on the past-practice evidence to resolve the ambiguity somehow made Goldberg's reliance on the extrinsic evidence improper.

_____

[10] The concerns animating the concurring judge's separate opinion are not relevant to the issue before us. *See* 230 F.3d at 1145-46 (Rovner, J., concurring in the judgment).

33

But that omission has no bearing on the propriety of using extrinsic evidence to resolve an ambiguity. Unless the parties stipulate otherwise, and they apparently did not here, an arbitrator is under no obligation to provide explanations with his award. *See Enter. Wheel & Car*, 363 U.S. at 598, 80 S. Ct. at 1361; *Cat Charter*, 646 F.3d at 844.

Ultimately, no basis exists to vacate the arbitration award here. Goldberg had the authority to construe the CBA's timeliness provisions, and he did so when characterizing the Union's grievance as a continuing violation. Goldberg also had the authority to uncover an ambiguity in the CBA and resolve it by reference to the parties' past practices. For these reasons, the district court did not err in declining to vacate the arbitration award.

## C. The District Court Did Not Abuse Its Discretion in Denying the Union's Motion for Attorney's Fees

In its cross-appeal, the Union contends that the district court abused its discretion in denying the Union's motion for attorney's fees for defending against the Company's challenge to the arbitration award because the court allegedly provided no explanation for its decision. The Union also maintains that it is entitled to attorney's fees because the Company's attempt to vacate the award was baseless. We disagree on both fronts and affirm the district court's denial of the fees motion.

34

Although section 301 of the LMRA does not expressly authorize attorney's fees, we have held that "a court can grant attorney's fees under its equity power if a party violates § 301(a) in bad faith, vexatiously, wantonly or for oppressive reasons." *Varnes v. Local 91, Glass Bottle Blowers Ass'n*, 674 F.2d 1365, 1369 (11th Cir. 1982). In the context of challenges to awards under the FAA, we have provided "notice" that "this Court is exasperated by those who attempt to salvage arbitration losses through litigation that has no sound basis in the law applicable to arbitration awards" and has warned litigants that "we are ready, willing, and able to consider imposing sanctions in appropriate cases." *B.L. Harbert Int'l, LLC v. Hercules Steel Co.*, 441 F.3d 905, 913-14 (11th Cir. 2006), *abrogated on other grounds by Frazier*, 604 F.3d at 1324. That said, though, we have declined to order sanctions when at least some plausible argument supported the challenge or the challenge raised an argument we had not yet addressed. *See, e.g.*, *Gonsalvez v. Celebrity Cruises, Inc.*, 750 F.3d 1195, 1198 (11th Cir. 2013) (per curiam); *Hercules Steel*, 441 F.3d at 914.

A district court must articulate the reasoning behind its award or denial of attorney's fees in order to permit meaningful review. *Tilton v. Playboy Entm't Grp., Inc.*, 554 F.3d 1371, 1379 (11th Cir. 2009). When it fails to do so, a district court abuses its discretion. *See Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1304 (11th Cir. 1988).

35

In the pending case, the district court did articulate its reasons for denying attorney's fees.  More specifically, after recounting the standards for awarding attorney's fees in § 301 cases, the district court stated,

> While attorneys' fees and expenses may be awarded "when a party on the losing end of an arbitration decision seeks to overturn that decision without any real basis for doing so," *West Flagler Associates, Ltd. v. Unite Here Local 355*, No. 10–20316–CIV, 2012 WL 92766, *2 (S.D. Fla. Jan. 11, 2012), this is not such a case.  Even though the Company will not prevail on its motion, the court concludes the motion was not baseless, frivolous, or filed for an improper purpose.

This discussion identifies the correct standard and explains that the district court declined to award fees because that standard was not met.  The court's thorough order analyzing the Company's challenge to the arbitration award demonstrates why the district court concluded that the challenge was not baseless.  The court sufficiently explained its reasoning for purposes of review.

Further, while the Company did not prevail on its continuing-violation and extrinsic-evidence arguments, those arguments were not completely baseless.  This Circuit does not have express, controlling case law definitively foreclosing those arguments.  And prior to today, we had no case law on whether a recurring paycheck violation like the one at issue here could be considered a "continuing violation" under a collective-bargaining agreement.  Nor did we have any case law analyzing whether a zipper clause combined with a no-modification clause could

prohibit an arbitrator from employing extrinsic evidence to resolve an ambiguity. Given the absence of controlling case law on these issues, sanctions were unwarranted. *See Gonsalvez*, 750 F.3d at 1198.

### IV. CONCLUSION

We conclude that no jurisdiction exists over the Company's appeal of the district court's order compelling arbitration. In all other respects, the district court's orders are affirmed.

**DISMISSED IN PART; AFFIRMED IN PART.**