[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-13879

_____

UBS FINANCIAL SERVICES, INCORPORATED
OF PUERTO RICO,

Plaintiff-Appellee,

*versus*

DAVID EFRON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:22-cv-23924-DPG

_____

Before ROSENBAUM, NEWSOM, and MARCUS, Circuit Judges.

PER CURIAM:

On appeal, David Efron asks us to reverse the district court's order denying his motion to vacate a nearly $6.5 million arbitration award to UBS Financial Services, Incorporated of Puerto Rico ("UBS"), and confirming that same award. After reviewing the parties' briefs and the record, and with the benefit of oral argument, we find no reversible error and affirm the district court's judgment.

## I.     BACKGROUND

### A.    *Initial Divorce Proceedings and UBS's Settlement Payment*

In 2001, David Efron and his wife Maria Candelario Del Moral divorced. *Candelario Del Moral v. UBS Fin. Servs. Inc. of P.R.*, No. 08-1833, 2016 WL 1275038, at *2 (D.P.R. Apr. 6, 2016). Efron and Candelario litigated the division of their marital assets, and in 2006 the Puerto Rico Court of Appeals affirmed an order directing Efron to pay Candelario $50,000 per month as an advance on her share of the marital estate. *Id.* At some point, Efron stopped paying. So Candelario got a court order attaching Efron's assets. *Id.* By then, Efron's debt to her had reached about $4.1 million. *Id.*

Candelario served the attachment order on UBS, and the company restrained Efron's accounts. *Id.* But shortly after, the judge who issued the attachment order verbally vacated it. *Id.* at *7. Candelario sought a stay of that verbal order but the appellate court dismissed her motion for lack of jurisdiction because the

unsigned hearing "minute" order was not an official order. *Id.* at \*7–8. And after Efron provided UBS with the "minute" order and documents related to Candelario's appeal, UBS restored control of the accounts to him. *Id.* at \*8–9. Eventually, a new judge reinstated the original attachment order and directed UBS to liquidate Efron's accounts to satisfy his debt to Candelario. *Id.* at \*10.

At the time the restraints were released, Efron had about $11.5 million in his investment account with UBS and $7.5 million in debt to UBS's affiliate. *Id.* at \*11. Efron was also allowed to borrow an additional approximately $827,000. *Id.* at \*12. But by the time the order was reinstated, the UBS debt was fully paid off, and Efron further withdrew funds, leaving about only $350,000 in the account to pay Candelario. *Id.* at \*11–12.

Candelario sued UBS in the United States District Court for the District of Puerto Rico for negligently returning control of Efron's accounts to him. *Id.* at \*3. In April 2016, the district court found UBS liable and ordered it to pay Candelario $4.7 million plus interest. *Id.* at \*36. The parties settled for $4.45 million.

### B.    *The Master Account Agreement*

Efron's account with UBS was governed by a Master Account Agreement ("MAA"). The MAA, in relevant part, provided that Efron "agree[d] to indemnify UBS . . . against any losses arising from . . . any debits, charges, fees or other obligations in the Account." It also specified that Efron "shall be liable to UBS . . . for any deficiency remaining in the Account in the event of liquidation . . . ." and Efron "further agree[d] to indemnify UBS . . . against

any loss, cost, expense, liability or damages arising out of [Efron]'s obligations hereunder." Besides these responsibilities, the MAA made Efron "liable for any and all losses, claims, damages, penalties, fines, settlements, costs, causes of action, debts, dues, sums of money, accounts, accountings, reckonings, acts, omissions, demands, obligations, actions, suits, proceedings, judgments, liabilities and expenses (including without limitation all expenses of litigation or preparation therefor, whether or not UBS . . . is a party thereto) which UBS . . . may pay or incur arising out of any claims by any person or entity in any way relating to this Account."

The MAA also required that any dispute be resolved in arbitration, governed by the Federal Arbitration Act ("FAA"). And such arbitration would follow "the laws of the State of New York . . . without giving effect to the choice of law or conflict of laws provisions thereof . . . ."

### C.　*Arbitration Proceedings*

Citing the MAA, UBS demanded that Efron reimburse it for its settlement payment to Candelario. Efron refused, and the parties submitted the dispute for resolution before Financial Industry Regulatory Authority ("FINRA") arbitrators. This resulted in the formation of three separate arbitration panels, which we describe as relevant.

1. The First Panel

As FINRA convened the first arbitration panel, UBS presented claims for contractual indemnification, unjust enrichment,

and equitable contribution. Efron counterclaimed with claims of negligence, breach of implied contract, and breach of fiduciary duty.

The panel set evidentiary hearings for April 2018. *Efron v. UBS Fin. Servs. Inc. of P.R.*, 300 So. 3d 733, 735 (Fla. Dist. Ct. App. 2020). Efron filed two motions to postpone the hearings, one because it conflicted with a trial he, as an attorney himself, was scheduled to litigate and the other because his counsel withdrew eleven days before the scheduled hearings. *Id.* The panel denied both motions. *Id.* So the hearings took place as scheduled, and UBS presented witnesses and argument. *Id.* Efron did not attend. *Id.* In May 2018, the arbitrators awarded UBS about $9.7 million plus costs and attorneys' fees.

UBS moved to confirm that first award in Florida state court. *Id.* That court confirmed the award, but an appellate court vacated it. *Id.* at 735–37 (citing 9 U.S.C. § 10(a)(3)). It did so because it ruled the arbitrators unreasonably denied Efron's second postponement motion. *Id.* So on remand, the state lower court "directed [the parties] to proceed with a rehearing" before FINRA with "a new panel of arbitrators."

### 2. The Second Panel

FINRA then convened a second panel to hear the parties' dispute. Around the same time, Efron requested a 60-day and then 45-day postponement to acquire counsel.

In June 2021, an initial prehearing conference scheduling meeting occurred. UBS and the three new arbitrators attended it, but Efron did not. After the meeting, the arbitrators released an order setting the hearing for November 2021. Before the hearing could occur, Efron produced a purported copy of the order from the June 2021 initial prehearing conference that seemed to mark both the new arbitrators and the original 2018 arbitrators as in attendance at that proceeding.

UBS maintains that Efron's copy of the order was illegitimate and that the 2018 arbitrators were not in attendance at the initial prehearing conference. But Efron filed for relief in Florida state court requesting that the court order that any future arbitrations not be before FINRA.

Efron also wrote FINRA stating, "I believe these arbitrators may be liable to me at this point." And Efron subpoenaed both the 2018 and 2021 arbitrators for depositions. The second FINRA panel eventually withdrew from the case, and the arbitration was postponed.

### 3. The Third Panel

FINRA convened a third arbitration panel in March 2022. Both parties participated in the process and approved the selected panel. Efron also received more discovery, including 400 new pages of documents, in addition to the 20,000 pages UBS had previously produced. And the arbitrators gave Efron leave to serve four trial subpoenas. In furtherance of the arbitration, the parties submitted pre-hearing briefs and exhibits.

23-13879                Opinion of the Court                7

In the summer of 2022, FINRA held a five-day evidentiary hearing. At the start, Efron reaffirmed his acceptance of the panel's members. After opening statements, UBS presented its case, and Efron cross-examined UBS's witnesses. During Efron's cross examination, UBS admitted that it had released the restraints on Efron's account based on its own independent decisions, not in reliance on Efron's representations.

For its part, UBS presented evidence, over Efron's objections, that Efron engaged in dilatory tactics in prior proceedings. Efron characterizes that evidence as "inflammatory evidence [that] was clearly introduced to taint and prejudice the panel . . . ." UBS responds that its purpose in introducing that evidence was to recover attorneys' fees it incurred in those proceedings. At one point in the hearing, an arbitrator assured Efron that "[w]e're going to overrule the objection [to the introduction of this evidence] . . . . If there is a concern that . . . it's somehow going to bias the panel, I assure you, you have nothing to worry about. It's a strong enough panel that we know that those have no precedential value."

UBS also introduced evidence that, in its words, "two federal courts had found that Efron previously made false statements with the intent to purposefully mislead a federal magistrate judge." Although UBS asserts it introduced that evidence for impeachment purposes, Efron argues it was unfairly prejudicial. UBS used four days to present its case.

By contrast, Efron rested his case after less than one day. He called just one witness, a former employee of UBS. In a closing

statement, Efron's counsel thanked the panel for "the time [it had] taken to carefully listen to all of the witnesses and consider all of the evidence during this final hearing," and noted that he "appreciate[d] the fairness and . . . the objectivity which [they had] attended to the various issues that have arisen during this hearing . . . ." And when the panel gave Efron the opportunity to raise "any other issues or objections . . . that have not been previously raised," Efron's counsel responded, "I have no issues." In fact, Efron's counsel requested that the proceedings conclude early so that he could catch a flight and avoid additional expenses for his client.

The arbitrators then requested post-hearing briefing on whether they could award costs and attorneys' fees. And to assist them in their deliberations, the arbitrators asked the parties for draft awards, including the basis for any relief and discussion of any relevant choice-of-law analyses.

UBS asked for nearly $14.5 million, broken down as $4.45 million for its settlement payment, plus interest, litigation costs, and collection expenses. Efron responded with several arguments. Among these, he contended that under both Puerto Rico and New York law, UBS was not entitled to indemnification, and an implied contract—not the MAA—should govern the parties' dispute.

## D.    The Award

The third panel awarded UBS $6,480,854.80, broken down as $4.45 million in compensatory damages, $529,854.80 in interest, and $1.501 million in costs and attorneys' fees. In a section entitled,

"Other Issues Considered and Decided," the panel noted that Efron "requested a reasoned award and [UBS] did not." So "[t]he Panel did not provide an explanation." But the award also included a "Case Summary," which identified the causes of action it considered:

> Claimant asserted the following causes of action: contractual indemnification; unjust enrichment; and equitable contribution. The causes of action relate to a post-judgment settlement payment that Claimant made to Respondent's ex-wife following litigation ("the Candelario litigation") in the U.S. District Court for the District of Puerto Rico.

> Unless specifically admitted in the Statement of Answer, Respondent denied the allegations made in the Statement of Claim and asserted various affirmative defenses.

> In the Counterclaim, Respondent asserted the following causes of action: negligence; breach of implied contract; and breach of fiduciary duty. The causes of action relate to Claimant's handling of Respondent's account

subsequent to a ruling made in the Candelario litigation.

Unless specifically admitted in the Answer to Counterclaim, Claimant denied the allegations made in the Counterclaims and asserted various affirmative defenses[.]

And in the section titled, "Other Issues Considered and Decided," the "Arbitrators acknowledge[d] that they ha[d] each read the pleadings and other materials filed by the parties." And the section explained that "[t]he Award in this matter may be executed in counterpart copies."

### E.    District Court Proceedings

UBS moved to confirm the award in Florida state court. But Efron removed to the United States District Court for the Southern District of Florida and moved to vacate. He argued all four FAA grounds for vacatur of an arbitration award, as codified at 9 U.S.C. § 10(a), were met.

Specifically, Efron asserted that the arbitrators violated FINRA Rule 12904(e)'s requirement that the award contain "[a] summary of the issues" and "[a] summary of any other issues resolved." In Efron's view, the panel had to expressly identify in its award whether it based its decision on UBS's contract or equitable claims and if it decided the choice-of-law sub-issue. Efron also

alleged that UBS procured the award through misconduct because UBS introduced material against him that Efron thought was unfairly prejudicial. And he contended, at the least, the award of attorneys' fees should be vacated because UBS's counsels' bills were addressed to and paid by UBS Investment Bank, a separate entity from UBS Financial Services.

The district court agreed with UBS, confirmed the award, and denied the motion to vacate. It held that because both parties did not request a reasoned award, "the 2022 Panel was not required to specifically discuss its choice-of-law analysis in the 2022 Award." Instead, "[a]ll that FINRA Rule 12904(e) requires is that an award include 'a summary of the issues' which the 2022 Award contained. It does not require a full recitation of every issue resolved by the 2022 Panel." (internal citations omitted). The court also ruled that "[t]he omission of the choice-of-law analysis in the 2022 Award does not rise to the level of affirmative misconduct that would prejudice Efron" and "it cannot then be said that the 2022 Panel exceeded or imperfectly executed its powers." And "[e]ven if the 2022 Panel had violated FINRA Rule 12904(e)," the court reasoned, "a violation of FINRA procedures is . . . not a basis for vacatur."

Finally, the district court observed that "Efron spen[t] a major portion of his Motion arguing that the 2022 Panel should have applied Puerto Rico law, and that the 2022 Panel erred, under Puerto Rico law, in issuing the 2022 Award." But, the court held, "[i]t [was] not for [the district court] to consider the merits of Efron's claims under Puerto Rico law."

Efron now appeals the decision to confirm and refusal to vacate the arbitration award.

## II.        STANDARD OF REVIEW

We review a district court's confirmation of an arbitration award and the denial of a motion to vacate under two standards: we review findings of fact for clear error and legal conclusions de novo. *Frazier v. CitiFinancial Corp.*, 604 F.3d 1313, 1321 (11th Cir. 2010). "Because arbitration is an alternative to litigation, judicial review of arbitration decisions is among the narrowest known to the law." *AIG Baker Sterling Heights, LLC v. Am. Multi-Cinema, Inc.*, 508 F.3d 995, 1001 (11th Cir. 2007) (citation and internal quotation marks omitted). "[C]onvincing a court of an arbitrator's error— even his grave error—is not enough" to justify vacatur. *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 572 (2013). Instead, a party moving to vacate an award must establish a specific statutory ground for vacatur. *See Frazier*, 604 F.3d at 1324.

## III.        DISCUSSION

Efron asks us to reverse the denial of his motion to vacate the arbitration award and the confirmation of that award. Under the FAA, as codified at 9 U.S.C. § 10(a), only four grounds for vacatur exist. First, the FAA permits vacatur when "the award was procured by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(1). Second, we may vacate when "there was evident partiality or corruption in the arbitrators . . . ." *Id.* § 10(a)(2). Third, Efron may show "the arbitrators were guilty of misconduct in refusing to

postpone the hearing . . . , or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." *Id*. § 10(a)(3). And finally, vacatur is appropriate when "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." *Id*. § 10(a)(4).

In his briefs, Efron appears to advance four principal arguments to satisfy these stringent standards. First, he contends that the arbitrators violated FINRA Rule 12904(e) requiring that they identify all issues they resolved in their award. He highlights that the arbitrators did not expressly note they considered the "interpretation and enforceability of the indemnification provision of the MAA" and "the choice-of-law issue" in their award summary. Efron also contends that the arbitrators violated Rule 12904(e) by not stating that they resolved UBS's equitable claim. Those issues, he argues, had to be addressed because they were central to the merits of his dispute. And Efron concludes that their omission from the express terms of the award are grounds for vacatur as misconduct under § 10(a)(3) or the arbitrators' exceeding their power under § 10(a)(4).

Second, Efron suggests if the arbitrators addressed those issues, they got the law so wrong that they failed to interpret the

disputed contract. As a result, Efron urges, the arbitrators committed misconduct and exceeded their powers.[1]

Third, Efron argues that UBS introduced what he claims to be unfairly prejudicial evidence. And because of that, Efron claims, UBS "procured [the award] by misconduct, undue means, or a biased and prejudiced panel."

Finally, at a minimum, Efron asserts we should vacate the award of attorneys' fees based on the same arguments he made against the damages award and because "invoices for UBS's counsel were addressed to and paid by UBS Investment Bank, a totally different entity from the claimant in this action."

Efron has not met his burden to show that any of these arguments satisfy the FAA's grounds for vacatur. So we affirm the denial of his motion to vacate and the confirmation of the award. We address each in turn.

### A. The arbitrators did not violate FINRA Rule 12904(e), and even if they did, Efron has not established grounds for vacatur on this basis under §§ 10(a)(3) or (4).

FINRA Rule 12904(e) sets forth a list of subjects that "shall" be addressed in a FINRA award. FINRA Rule 12904(e).

---

[1] Efron asserts this argument is not separate from his first. Rather, he says it shows that if the arbitrators violated Rule 12904(e), they caused him prejudice. But because it appears to us to be an alternative argument—that is, it can't both be the case that the arbitrators didn't consider the issues at all and that they addressed them but did so incorrectly—we address it on its own.

Subsections (4) and (7) provide that the award "shall contain . . . [a] summary of the issues, including the type(s) of any security or product, in controversy," and "[a] statement of any other issues resolved," respectively. *Id.*

Efron argues that the arbitrators violated Rule 12904(e) because they did not expressly state in their award that they addressed (1) "interpretation and enforceability of the indemnification provision of the MAA," (2) "resolution of which law to apply in making those determinations," and (3) "UBS's equitable claim." He asserts that FINRA Rule 12904(e) is a mandatory and substantive rule governing FINRA arbitrations. So, Efron urges, the failure to comply with it constitutes misconduct and shows the arbitrators exceeded their powers.

Efron's argument fails. For starters, the arbitration award *did* mention two out of the three "issues" Efron claims it needed to. Efron argues the award had to state the panel addressed the "interpretation and enforceability of the indemnification provision of the MAA." But the award did so when it noted that it adjudicated a claim for "contractual indemnification." That is just a more succinct way of saying the panel interpreted and enforced the MAA's indemnification provision. As for "UBS's equitable claim," the award expressly reflects the panel addressed that as well. Indeed, the award notes the panel considered claims of "unjust enrichment" and "equitable contribution." And those are just more specific labels for UBS's equitable claims.

For these two issues, Efron only quibbles with the language the panel used to describe them. He effectively asks us to interpret FINRA Rule 12904(e) to require the panel to use his preferred magic words. But all Rule 12904(e) mandates is a simple "summary of the issues." We have no trouble concluding that the panel satisfied that requirement for these two issues, and Efron offers no authority to the contrary.

As for Efron's complaint that the award should have mentioned it resolved the choice-of-law issue, that also fails. To be sure, the award didn't expressly discuss that sub-issue. But it didn't have to. Generally, "arbitrators have never been required to explain their awards," as that "would defeat the policy in favor of expeditious arbitration." *Raiford v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 1410, 1413 (11th Cir. 1990); *see also United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Wise Alloys, LLC*, 807 F.3d 1258, 1275 (11th Cir. 2015) ("Unless the parties stipulate otherwise . . . an arbitrator is under no obligation to provide explanations with his award."). Indeed, we have recognized that "in a typical arbitration where no specific form of award is requested, arbitrators may provide a 'standard award' and simply announce a result." *Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836, 844 (11th Cir. 2011).

FINRA arbitrations are no exception. Under Rule 12904(g), an explained decision is necessary only upon the joint request of both parties. FINRA Rule 12904(g)(1). And even an explained decision can offer only "general reason(s)" with no citations to legal

authority or damage calculations. *Id.* 12904(g)(2). As both parties recognize, a reasoned decision was not required here because UBS didn't request one. Particularly given "the policy in favor of expeditious arbitration," *Raiford*, 903 F.2d at 1413, a recitation of subsidiary issues, like a choice-of-law analysis, is not necessary in an unreasoned FINRA award. Indeed, the line-drawing necessary to determine what would count as a subsidiary issue for purposes of Rule 12904(e) would generate substantial post-award litigation and defeat the efficiency of arbitration.

Rather, on confirmation, an award need only offer clear instruction for review by a confirming court by providing the claims adjudicated. We rarely care about the underlying rationale for an arbitrator's decision, so long as there's enough information to determine that the arbitrators properly had authority to make an award. *See Gherardi v. Citigroup Global Markets Inc.*, 975 F.3d 1232, 1237 (11th Cir. 2020) ("[A]n arbitrator's actual reasoning is of such little importance to our review that it need not be explained—the decision itself is enough."). And we have that information here, regardless of whether the award specifically mentions "choice of law." Again, Efron offers no authority for his burdensome reading of the "summary of the issues" requirement.

But even if we were to assume that the award violated the "summary of issues" rule (as we've explained, it doesn't), 9 U.S.C. § 11(c) provides that a court may modify an award that "is imperfect in matter of form not affecting the merits of the controversy." That provision suggests that, under the FAA, a simple formulaic error in

the award is better addressed by modifying it rather than vacating it under 9 U.S.C. § 10(a). We think modification a more appropriate form of relief for such a Rule 12904(e) violation.[2]

In sum, Efron has failed to meet his burden to show that the arbitrators violated FINRA Rule 12904(e), and, if they did, that such a violation can warrant vacatur of the award.

### B. The arbitrators arguably interpreted the MAA, so Efron is not entitled to vacatur under § 10(a)(4) on the basis that the arbitrators exceeded their powers.

We move now to Efron's implicit second argument: that the arbitrators exceeded their power by modifying instead of interpreting the MAA. Under § 10(a)(4), a court may vacate an award "only when the arbitrator strayed from his delegated task of interpreting a contract, not when he performed that task poorly." *Oxford Health Plans*, 569 U.S. at 572. The "sole question" for courts evaluating such a § 10(a)(4) motion is "whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong." *Id.* at 569. As a result, courts should "defer entirely to the arbitrator's interpretation of the underlying contract no matter how wrong [they] think that interpretation is." *Wiregrass Metal Trades Council AFL-CIO v. Shaw Env't & Infrastructure, Inc.*, 837 F.3d 1083, 1087 (11th Cir. 2016).

---

[2] We do not consider whether a violation of FINRA Rule 12904(e) can ever serve as a basis for vacatur under the FAA. Even assuming without deciding that it can, no such basis exists for the specific violation alleged here for the reasons we've explained.

23-13879                Opinion of the Court                19

Still, "an arbitrator may not ignore the plain language of the contract." *Id.* at 1088 (quoting *Warrior & Gulf Navigation Co. v. United Steelworkers of Am., AFL-CIO-CLC*, 996 F.2d 279, 281 (11th Cir. 1993) (per curiam)). So "an arbitration decision may be vacated under § 10(a)(4)" only in the rare instance "when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice.'" *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671–72 (2010) (citation modified). We recognize that "the task of an arbitrator is to interpret and enforce a contract, not to make public policy." *Id.* at 672.

"To determine whether the arbitrator engaged in interpretation, as opposed to modification, we begin by looking at the relevant language in the [contract] and asking, as a threshold matter, whether that language is open to interpretation." *Wiregrass*, 837 F.3d at 1088. "We have said that contract language is susceptible to an arbitrator's interpretation when it is sufficiently ambiguous on its face or when there are two plausible interpretations of an agreement, which is pretty much the same thing." *Id.* (citation modified). A contract can also be ambiguous, even when it's not "facially ambiguous," because of implied terms. *Id.* at 1088–89.

Efron argues that the MAA unambiguously provides that he is not liable to indemnify UBS for its own negligence. He argues the contract contains no express terms allowing for his liability under those circumstances, and its express terms are limited to his own "obligations." Efron also claims UBS has never sought

indemnification for its own negligence from other customers.  And he asserts it's absurd to suggest that an accountholder can be liable for UBS's own negligence.  Efron contends that UBS could not recover on its equitable claims under either New York or Puerto Rico law.

Then, Efron argues, even assuming the MAA is ambiguous, "the Award must be vacated because there is no evidence that the arbitrators interpreted the language to determine the parties' intent, and thus [the arbitrators] modified rather tha[n] interpreted the contract, which also requires vacatur under § 10(a)(4)."  He also argues the arbitrators failed to address the choice-of-law issue, committing legal error.  And, he insists, they should have applied Puerto Rico over New York law.  Had they done so, Efron asserts, he would have prevailed.  Efron hasn't met his burden to establish he's entitled to vacatur based on these arguments.[3]

We begin by reacknowledging that, despite Efron's suggestions to the contrary, if the contract is ambiguous, we must assume the arbitrators interpreted it.  *Wiregrass*, 837 F.3d at 1091–92.  So we assess only whether the contract is open to an interpretation supporting UBS's position.  It is.

The MAA contains a provision, which states that Efron

---

[3] UBS contends, that in addition to being wrong on the merits, Efron waived his failure-to-interpret arguments in the district court.  Because we agree that Efron has not shown that the panel failed to interpret the MAA, we need not and do not reach whether he waived this argument.

> shall be liable for any and all . . . settle-
> ments, . . . suits, proceedings, judg-
> ments, liabilities and expenses (includ-
> ing without limitation all expenses of lit-
> igation or preparation therefor, whether
> or not UBS . . . is a party thereto) which
> UBS . . . may pay or incur *arising out of*
> any claims by any person or entity *in any
> way relating to this Account.* (emphasis
> added).

We have long recognized that "[t]he phrase 'arising out of, or in any way contributed to' clearly evidences an intent that [an] indemnification provision be construed broadly." *Natco Ltd. P'ship v. Moran Towing of Fla., Inc.*, 267 F.3d 1190, 1194 (11th Cir. 2001). The language of the MAA closely mirrors this phrase. So the panel could have reasonably construed the MAA's indemnification provision broadly. And that provision encompasses any "settlements" that arise out of the account. As a result, a fair-minded interpreter could have found that the Candelario settlement fell within the contractual language.

As for Efron's argument that the panel could have wrongfully applied New York and not Puerto Rico law, a Puerto Rican federal district court recently upheld the MAA's choice-of-law provision, which specifies New York law, as consistent with the public policy of Puerto Rico. *See Efron v. UBS Fin. Servs. Inc.*, No. 24-1168, 2025 WL 966796, at *16–17 (D.P.R. Mar. 31, 2025). This more than

sufficiently establishes that the arbitrators could have arguably found New York law applicable.

At bottom, Efron simply seeks to relitigate the merits of his dispute with UBS. But "convincing a court of an arbitrator's error—even his grave error—is not enough" to justify vacatur. *Oxford Health Plans*, 569 U.S. at 572. So these arguments don't warrant vacatur of the arbitration award.

### C. Efron has not shown that UBS procured the award by partiality, corruption, or undue means.

We turn next to Efron's third argument that the award was a "[p]roduct of UBS's [m]isconduct." The district court found that Efron did not present evidence that UBS procured the award through partiality, corruption, or undue means, under 9 U.S.C. §§ 10(a)(1) & (2). We see no clear error in that finding.

Under 9 U.S.C. § 10(a)(1), a court may vacate an arbitration award when the award was "procured by corruption, fraud, or undue means." As our sister circuits have recognized, we read the term "undue means" in conjunction with the preceding terms, "corruption" and "fraud." *See PaineWebber Grp., Inc. v. Zinsmeyer Trs. P'ship*, 187 F.3d 988, 991 (8th Cir. 1999). So "undue means . . . connotes behavior that is immoral if not illegal." *A.G. Edwards & Sons, Inc. v. McCollough*, 967 F.2d 1401, 1403 (9th Cir. 1992) (per curiam).

As for § 10(a)(2), vacatur is warranted when there is "evident partiality or corruption in the arbitrators. A movant may prove evident partiality when either (1) an actual conflict exists, or (2) the

arbitrator knows of, but fails to disclose, information which would lead a reasonable person to believe that a potential conflict exists." *Grupo Unidos por el Canal, S.A. v. Autoridad del Canal de Panama*, 78 F.4th 1252, 1262–63 (11th Cir. 2023) (internal quotation marks and citations omitted). Section 10(a)(2) is "strictly construed," and "the alleged partiality must be direct, definite and capable of demonstration rather than remote, uncertain and speculative." *Id.* (brackets omitted) (quoting *Gianelli Money Purchase Plan & Tr. v. ADM Inv. Servs., Inc.*, 146 F.3d 1309, 1312 (11th Cir. 1998)).

Efron argues that vacatur is warranted on these grounds, as well as under §§ 10(a)(3) & (4), because UBS introduced evidence that allegedly "dominated and permeated the arbitration, biased and prejudiced the arbitrators against Efron, and induced the misconduct of the panel." He takes issue with UBS's introduction of evidence about "(1) what transpired in the prior arbitration, which was reversed due to misconduct by the arbitrators induced by UBS; (2) findings by the circuit court that were reversed on appeal; (3) the dispute in the circuit court over the Scheduling Order, which was never resolved; (4) the selection of the arbitrators; and (5) other unrelated matters." He also asserts, citing no evidence other than his attorney's assertions at the arbitration hearing, that UBS introduced documents that were supposed to be restricted from the new panel. And he faults the arbitrators for "den[ying] nearly every one of Efron's objections, allow[ing] UBS to put Efron's character on trial, violat[ing] mandatory FINRA rules, and fail[ing] to perform the only tasks it had the authority to arbitrate." Plus, Efron suggests his loss at arbitration alone indicates misconduct.

None of these assertions rises to the standard of "immoral" conduct.  Nor do they establish partiality or corruption by the arbitrators.  Even if we agreed that the arbitrators made a few wrong evidentiary rulings (we don't opine on that), that would not be grounds for vacatur.  And there is no evidence that the arbitrators were prejudiced.  To the contrary, even Efron's counsel *thanked* the arbitrators for their objectivity as he closed.  In short, Efron has not met his burden to establish misconduct by the arbitrators.

### D. Efron has not established that UBS's award of attorneys' fees should be vacated.

In a single paragraph in his initial brief, Efron contends that the award of attorneys' fees should also be vacated (1) for the same reasons as the rest of the award and (2) because UBS Investment Bank, which he claims is a separate entity from UBS Financial Services, paid counsel's bills.  He argues only the entity directly paying the bills can claim and recover fees.

Because we have rejected Efron's arguments as to the rest of the award, we consider only his argument that fees are not recoverable because UBS Financial Services did not pay them.  But Efron cited only one thing in support of this argument: a portion of the arbitration transcript where Efron's attorney made the same claim.  That is not evidence to support the claim.  And Efron offers no legal authority to bolster his position.

Because Efron has not sufficiently briefed this argument, he has waived it.  We will not consider "[a] passing reference to an issue in a brief . . . , and the failure to make arguments and cite

authorities in support of an issue waives it."[4] *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012), *overruled in part by United States v. Durham*, 795 F.3d 1329, 1330 (11th Cir. 2015) (en banc); *see also In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.").

## IV.    CONCLUSION

For these reasons, we affirm the judgment of the district court.

**AFFIRMED.**

---

[4] UBS did not address the attorneys' fee argument in its brief, so Efron claims UBS forfeited it. But we may affirm on any ground that the record supports. *PDVSA US Litig. Tr. v. LukOil Pan Americas LLC*, 65 F.4th 556, 562 (11th Cir. 2023). So UBS didn't forfeit any argument by failing to raise it in its brief.